IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| BLF LAND, LLC and <br> BLAINE LARSEN FARMS, INC., <br>    *Plaintiffs* <br> <br> V. <br> <br> ALLEN FRERICH, MARK HOWARD, <br> JUSTIN CROWNOVER, HAROLD GRALL, <br> BOB ZIMMER, DANNY KRIENKE, and <br> GENE BORN, in their individual capacities and <br> in their official capacities as directors of the <br> North Plains Groundwater Conservation District <br> and NORTH PLAINS GROUNDWATER <br> CONSERVATION DISTRICT, <br>    *Defendants.* | § <br> § <br> § <br> § <br> § <br> § CASE NO. 2:23-cv-00133 <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § |

## ORIGINAL COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

NOW COME BLF LAND, LLC and BLAINE LARSEN FARMS, INC. (collectively "Larsen") and file this Original Complaint against Defendants ALLEN FRERICH, MARK HOWARD, JUSTIN CROWNOVER, HAROLD GRALL, BOB ZIMMER, DANNY KRIENKE, and GENE BORN in their individual capacities ("Individual Defendants"), and in their official capacities as directors of the North Plains Groundwater Conservation District ("Director Defendants"), and the North Plains Groundwater Conservation District ("NPGCD") alleging as follows:

## I.
## PARTIES

1. Plaintiff BLF LAND, LLC is a limited liability company formed under the laws of

the State of Idaho with its principal office in Idaho, and authorized to do business in Texas.

2.      Plaintiff BLAINE LARSEN FARMS, INC. is a corporation formed under the laws of the State of Idaho with its principal office in Idaho, and authorized to do business in Texas.

3.      Defendant ALLEN FRERICH ("Frerich") is an individual who resides in Dallam County, Texas and serves on the Board of Directors of NPGCD. Defendant Frerich may be served with process herein at the offices of NPGCD at 603 E. 1st St. Dumas, Texas 79029. Defendant Frerich is sued in his individual capacity and in his official capacity.

4.      Defendant MARK HOWARD ("Howard") is an individual who resides in Hartley County, Texas and serves as the President of the Board of Directors of NPGCD. Defendant Howard may be served with process herein at the offices of NPGCD at 603 E. 1st St. Dumas, Texas 79029. Defendant Howard is sued in his individual capacity and in his official capacity.

5.      Defendant JUSTIN CROWNOVER ("Crownover") is an individual who resides in Sherman County, Texas and serves on the Board of Directors of NPGCD. Defendant Crownover may be served with process herein at the offices of NPGCD at 603 E. 1st St. Dumas, Texas 79029. Defendant Crownover is sued in his individual and in his official capacity.

6.      Defendant HAROLD GRALL ("Grall") is an individual who resides in Moore County, Texas and serves on the Board of Directors of NPGCD. Defendant Grall may be served with process herein at the offices of NPGCD at 603 E. 1st St. Dumas, Texas 79029. Defendant Grall is sued in his individual and in his official capacity.

7.      Defendant BOB ZIMMER ("Zimmer") is an individual who resides in Hutchinson County, Texas and serves on the Board of Directors of NPGCD. Defendant Zimmer may be served with process herein at the offices of NPGCD at 603 E. 1st St. Dumas, Texas 79029. Defendant Zimmer is sued in his individual and in his official capacity.

8. Defendant DANNY KRIENKE ("Krienke") is an individual who resides in Ochiltree County, Texas and serves as the Vice President of the Board of Directors of NPGCD. Defendant Krienke may be served with process herein at the offices of NPGCD at 603 E. 1st St. Dumas, Texas 79029. Defendant Krienke is sued in his individual and in his official capacity.

9. Defendant GENE BORN ("Born") is an individual who resides in Lipscomb County, Texas and serves on the Board of Directors of NPGCD. Defendant Born may be served with process herein at the offices of NPGCD at 603 E. 1st St. Dumas, Texas 79029. Defendant Born is sued in his individual and in his official capacity.

10. Defendant NORTH PLAINS GROUNDWATER CONSERVATION DISTRICT ("NPGCD") is a political subdivision of the State of Texas. It may be served with process herein by serving its President, MARK HOWARD, at the offices of NPGCD at 603 E. 1st St. Dumas, Texas 79029.

## II.
## JURISDICTION AND VENUE

11. This Court has jurisdiction over this case pursuant to 28 U.S.C.A. § 1331 and 28 U.S.C.A. § 1343 because this action is brought to enforce Larsen's civil rights under 42 U.S.C.A. § 1983 and the First, Fifth and Fourteenth Amendments of the United States Constitution.

12. Venue is proper in this court pursuant to 28 U.S.C.A. § 1391(b) because Defendant NPGCD has its principle office or place of business in Moore County, Texas, which is within the Amarillo Division of the Northern District of Texas. One or more of the other Defendants reside in the Northern District of Texas, and a substantial part of the events or omissions giving rise to Larsen's claims occurred within the boundaries of the Northern District of Texas.

## III.
## FACTUAL BACKGROUND

13. NPGCD is a political subdivision of the State of Texas whose powers and authority are derived from the Texas Constitution and Chapter 36 of the Texas Water Code. Significantly, a groundwater conservation district can exercise only those powers specifically given to them; any exercise of powers beyond those expressly granted to them is *ultra vires* and void.

14. Larsen is in the business of growing potatoes, and grows a large majority of the potatoes grown in the State of Texas. Larsen owns or controls in excess of 50,000 acres of land in the District. According to District rules, Larsen should be entitled to produce in excess of 75,000 acre feet of groundwater per year.[1] Instead, Larsen produces less than 50,000 acre feet per year. Other users in the District use more groundwater per acre per year than does Larsen, but use it to raise crops different from those raised by Larsen. Specifically, other users subject to the same rules use more than 1-acre foot per acre per year to raise corn.

15. NPGCD has imposed fines on Larsen in the past two years for violations of its rules, specifically its production rules within what it terms "Groundwater Production Units" ("GPU's"). GPUs are parcels within contiguously owned acreage that the District requires property owners to define and report their groundwater production from. The District Rules constrain shape and size of GPUs as follows:

> 7.5 Limitations on a GPU's Size and Shape: A GPU shall contain no more than 1,600 acres and the most distant diagonal corners of the GPU shall not be more than 25,000 feet apart.
>
> 7.6. GPU Boundary: The boundary lines between two adjacent GPU that are under the same common ownership shall be

---

[1] NPGCD Rule 6.1. Allowable Annual Production: Allowable Annual Production shall be set by the Board.
   1. Allowable Annual Production shall be one and one-half (1.5) Acre-feet of Groundwater per acre of the Groundwater Production Unit ("GPU") unless amended pursuant to these Rules.
   2. Production limitations and pumping capacity limitations on all existing Well Permits, and Well Permits subsequently issued by the District are provisional as provided in Rule 2.4.

> coexistent with a Section boundary or sub-Section boundary with boundaries no smaller than a quarter of a quarter of a Section, whichever is smaller, based on midpoint protraction of the Section. For purposes of this Rule, a quarter Section is considered the standard quarter Section and refers to the NE/4, SE/4, NW/4 and SW/4 of a Section.

16. Rules 7.5 and 7.6 essentially require landowners, particularly owners of large tracts, to "balkanize" their property into sub-parcels according to arbitrary limitations on size and shape. The following image depicts a portion of the GPUs Larsen's property is divided into:



The shapes each of the above GPUs take are approved by the district, but they do not serve any statutorily authorized purpose or the purposes set forth in the District's Rules. There is no statutory authorization for these GPUs, and the imposition of fines based on production limits within such GPUs is and has been *ultra vires*. In addition to the other relief requested herein, Larsen seeks a declaration from this Court that the GPUs are not an authorized means of regulating groundwater and that NPGCD's Rule 7 is *ultra vires* and void.

17. Texas Water Code Chapter 36 carefully prescribes how a groundwater conservation district may go about regulating the production of groundwater. Section 36.116 contains the entirety of the authorized means of regulation. There are two authorized methods of regulating groundwater production: spacing and production limits. Section 36.116(a)(1) sets forth the only authorized spacing regulations. Under that section, a groundwater conservation district may regulate spacing by:

> a. Requiring all water wells to be spaced a certain distance from property lines or adjoining wells;
>
> b. Requiring all wells with a certain production capacity, pump size, or other characteristic related to the construction or operation of and production from a well to be spaced a certain distance from property lines or adjoining wells; <u>or</u>
>
> c. Imposing spacing requirements adopted by the (district) board (of directors).

Tex. Water Code § 36.116(a)(1)

18. Texas Water Code Section 36.116(a)(2) sets forth the only authorized means of regulating production of groundwater. That section provides that a groundwater conservation district may regulate production by:

> a. Setting production limits on <u>wells</u>;
>
> b. Limiting the <u>amount</u> of water produced based on acreage or tract size;
>
> c. Limiting the <u>amount</u> of water that may be produced from a defined number of acres assigned to an authorized <u>well site</u>;
>
> d. Limiting the maximum <u>amount</u> of water that may be produced on the basis of acre-feet per acre or gallons per minute <u>per well site per acre</u>;
>
> e. Managed depletion; or
>
> f. Any combination of the methods listed in (a) through (e) above.

Tex. Water Code § 36.116(a)(2)

19. Through its Rule 3.1, NPGCD has adopted spacing requirements based on pumping capacity, requiring wells to be spaced a minimum distance from both the nearest permitted well and property lines, apparently as contemplated under Texas Water Code Section 36.116(a)(1)(B).

20. Through Rule 6.1, NPGCD has established an "allowable annual production" standard of 1.5 acre-feet per acre, which could be authorized pursuant to Texas Water Code Section 36.116(a)(2), but has attempted to tie that regulation to its GPUs.

21. The GPUs NPGCD has attempted to impose on its landowners find no support in the Texas Water Code. Rule 7.1 requires a landowner to "declare" a GPU, and then states that the acreage in the GPU will be "allocated" to a well or wells within the GPU. Rule 7.5 puts a limitation on the acreage of any given GPU, stating that a GPU shall contain no more that 1,600 acres and that the GPU's most distant diagonal corners must not be more than 25,000 feet apart.

22. Rule 7.1 is not a spacing rule authorized by Texas Water Code Section 36.116(a)(1). NPGCD Rule 3.1 is its spacing rule under which it adopted spacings based on pumping capacity, and restrictions based on distances from other wells and property lines. Because Section 36.116(a)(1) is stated disjunctively, the use of the regulatory "tools" in Section 36.116(a)(1)(B) precludes other spacing rules that might fall under Section 36.116(a)(1)(C).

23. Rule 7.1 is not a regulatory tool based on production limits that might be authorized under Section 36.116(a)(2). All of the production limitations under Section 36.116(a)(2) are expressly tied to "amounts" of production. Rule 7.1 (and Chapter 7 as a whole) make no mention of amounts or production limitations. Rule 7.1 does not set a production limit on individual wells (Section 36.116(a)(2)(A)). It does not limit the amount of water that may be produced from a defined number of acres assigned to an authorized well site ((Section 36.116(a)(2)(B)). Rule 7.1

attempts to limit production based on acre-feet per acre (Section 36.116(a)(2)(C)), but improperly restricts the calculation of acre-feet per acre to the acreage contained in a GPU.

24. As applied to Larsen, Rule 7.1 arbitrarily limits its production of groundwater by requiring Larsen to establish a large number of GPUs, then restricting production from each GPU in such as way as to reduce the total production that Larsen can obtain from its acreage. The District's Rules require Larsen to pump water from areas with thin "saturated thickness." In these areas the "cone of depression impact" extends out further than it does in areas of "thick saturated thickness."  Larsen has two large blocks of contiguous acreage as shown below:



Note: Note The shaded (Yellow/Orange) areas are the approximate locations of BLF Land, LLC in western Dallam and Hartley Counties. Map prepared by North Plains Groundwater Conservation District.

The areas in the southern portion of Larsen's property have more saturated thickness than the areas in the north. This means that pumping in the southern portions of the property has less of an effect on Larsen's neighbors than pumping in the northern portions. Hydrologically, more production from the southern portions of Larsen's property would have less impact on Larsen's neighbors, but the District's GPU requirements effectively require Larsen to obtain water from the areas of thin saturated thickness in the northern portions of Larsen's acreage. The District's regulations fail

to promote the purpose of spacing rules (protecting neighbors from unnecessary drainage), and are therefore arbitrary and capricious.

25. The above limitations became constitutionally important because NPGCD claimed that Larsen had overproduced water during those years, based on overproduction in individual GPUs. If Larsen had been allowed to produce the amount of water it was entitled to produce at 1.5 acre-feet per acre of contiguous acreage, it would not have been in violation of the NPGCD rules and would not have incurred the fines imposed. By limiting Larsen's "allocation" based on GPU's, NPGCD essentially took Larsen's right to produce its groundwater, a right protected under Texas Water Code Section 36.002 and under the US and Texas Constitutions.

26. A groundwater conservation district is only entitled to regulate where it shows that there is a need for regulation and that the regulation is reasonable. With respect to the properties owned by Larsen, GPUs are not necessary. This is because any regulatory purpose contemplated by the GPU rule is fully served by the spacing and production limitations of the NPGCD rules. The GPU restrictions do nothing to further the regulatory purposes of the groundwater conservation district, and are therefore not necessary and not reasonable.

27. The GPU's set forth in NGCD's rules are arbitrary. There is no statutory support for a limitation of 1,600 acres per GPU, particularly where Larsen owns 50,000 acres of groundwater rights that are essentially blocked together. Unless NPGCD claims that its spacing and production limit rules are ineffective, those rules by themselves advance any legitimate regulatory goals of the district. Even less defensible is the limitation of 25,000 feet of distance between the furthest diagonal corners of each GPU. This is neither a spacing rule nor a production limitation standard, and a limitation on diagonal corners is clearly not found in the Texas Water Code. Under well-defined Texas case law, any regulatory authority exercised by a groundwater

conservation district must be clearly defined. Nothing in the Texas Water Code defines the existence, nature, extent or limitations of the so-called "Groundwater Production Units."

28. There is no hydrogeological rationale for requiring groundwater production to be tied to GPUs. The District has never offered such a rationale, and any hydrogeological rationale that could exist is undercut by the District's approval of the Larsen GPUs as illustrated above. These GPUs resemble a patchwork or puzzle, and fail to reflect any hydrogeological basis or benefit.

29. The GPU rules result in violation of Larsen's equal protection rights. Only large landowners are subject to these restrictions. Landowners with 640 acres or less, or who own tracts that are non-contiguous, do not have to comply with any part of Chapter 7 of the NPGCD rules. For example, a landowner with 50,000 non-contiguous acres is not bound by any provision in Chapter 7. Section 1983 prohibits the violation of equal protection rights under color of state law.

30. Because the GPU requirements of Chapter 7 are *ultra vires,* because those requirements result in a taking of private property without compensation, because those requirements violate Larsen's equal protection rights, and because those requirements are not necessary or reasonable regulatory tools, Larsen requests a declaration that the GPU requirements are void and cannot be enforced.

### IV.
### TAKING PRIVATE PROPERTY WITHOUT COMPENSATION UNDER COLOR OF STATE LAW

31. Groundwater in place, beneath the surface of the land, in Texas is a constitutionally protected property right under the U.S. and Texas Constitutions. *Day*; *Stratta v. Roe,* 961 F.3d 340, 356 (5th Cir. 2020). Chapter 36 of the Texas Water Code, from which the Defendants derive their authority, expressly recognizes and adopts the common law rule vesting ownership of groundwater

in landowners. TEX. WATER CODE § 36.002. Section 36.002 states in pertinent part that a landowner, including lessees and assigns, "owns the groundwater below the surface of the landowner's land as real property'' and that such ownership entitles the landowner to "drill for and produce the groundwater below the surface of real property." TEX. WATER CODE § 36.002(a), (b).

32. All groundwater rights owners are entitled to a fair opportunity to produce their fair share of the groundwater beneath their property. *Stratta v. Roe* at 357; *Day* at 831; *Elliff v. Texon Drilling Co.*, 210 S.W.2d 558 (Tex. 1949). Any denial of the right to produce a fair share of groundwater amounts to confiscation. *Marrs v. Railroad Commission*, 177 S.W.2d 941 (Tex. 1944). It is the duty of a regulatory body such as the NPGCD to protect property rights of landowners because each landowner is "...entitled to a fair chance to recover the [groundwater] in and under his land or the equivalent thereof and to prevent confiscation of his property." *Railroad Commission v. Shell Oil*, 380 S.W.2d 556 (Tex. 1964).

33. Because groundwater is a landowner's property, any order, regulation, or act that takes, damages, or destroys that property right without compensation is prohibited by the Fifth Amendment to the United States Constitution and by Section 17 of Article I of the Texas Constitution. *Marrs*, 177 S.W.2d at 949. NPGCD has affected an uncompensated taking of BLF's right to groundwater by denying Larsen its fair chance to recover the groundwater under its land and thereby prevent confiscation of its property. The District's production limitation of 1.5 acre-feet per acre per year apparently reflects the District's conclusion that 1.5 acre-feet per acre per year will give each landowner a fair share of the groundwater. Plaintiff is using well less than his fair share, but the District's actions restrict him to even less, effectively taking his groundwater.

34. A taking of property under color of state law violates 42 U.S.C. § 1983. As noted above, Larsen owns 50,000 acres of real property located in Dallam and Hartley Counties, Texas.

Under Texas law, Larsen owns the groundwater beneath that property. The operation of the District's Rules as outlined above effectively condemns vast quantities of Larsen's groundwater. Larsen seeks recovery of monetary damages equal to the value of the groundwater taken by NPGCD. Alternatively, Larsen seeks recovery of monetary damages equal to the amount by which the fair market value of its property has been diminished by the reduction in groundwater availability. As recently stated by the U.S. Supreme Court: "The government must pay for what it takes." *Cedar Point Nursery v. Hassid,* 141 S. Ct. 2063 (2021).

## V.
## EQUAL PROTECTION

35.  Larsen's vested property right to produce and beneficially use groundwater from its property may be subject to reasonable regulation to prevent waste or subsidence, or to serve some other legitimate governmental interest; however, such right may not be arbitrarily interfered with or damaged by officials acting under color of state or local law who are catering to their own biases, local political pressure or personal animosity rather than faithfully carrying out the legitimate duties of their office. U.S. Const. Amend. V and XIV; Tex. Const. Art. I, § 17; *EAA v. Day*, 369 S.W.3d 814 (Tex. 2012).

36.  On information and belief, the Board of Directors have targeted Larsen for rigorous enforcement of its GPU-based production limitations while allowing other similarly situated landowners to violate the production limitations without being subject to similarly-draconian penalties. The imposition and enforcement of GPU-based production limitations unquestionably has its roots in attempting to hobble large landowners in favor of smaller land owners. At a March 26, 2015 stakeholder meeting in Dalhart, the District's general counsel responded to a question regarding the purpose of the 1600-acre limit on GPUs by observing that:

> "One reason is District's attempt to balance regulation between small producers and large producers. Without GPU limits a large landowner could be virtually unregulated regarding production limits while the small groundwater right owner would remain regulated"

37. This explanation leaves much to be desired. There is no rational basis to believe that a 1.5 acre-foot-per-acre production limitation would expand to more than 1.5 acre-feet-per-acre merely because a landowner has more than 1600 contiguous acres. The rationale for the 1600-acre limit does reveal that its reason for being is to treat landowners differently based on how much land they own. There is no rational basis for this differential in treatment.

38. Under Rule 11.2, the District retains wide latitude to grant exceptions to its Rules. The strange thing about Rule 11.2 is that it provides for exceptions, but contains no standards at all governing when an exception will be granted. Compare Rule 11.2 with the Texas Railroad Commission's Rule 37, which provides that the Commission may grant exceptions to the Commission's spacing and density rules "to prevent waste or to prevent the confiscation of property." Standards give the Commission and reviewing courts a basis for deciding whether an exception should be granted in a particular case.

39. District Rule 11.2, completely without standards, allows and masks—and even encourages—arbitrary and capricious action. Under that rule, the Board can deny an application for exception for arbitrary and capricious reasons such as the Board members do not like the applicant, the applicant is from out-of-state or downstate, or the applicant is a business competitor of the board member. The Board can decide, arbitrarily and capriciously, that even though it has a rule authorizing exception, it never grants exceptions. On the other side of the coin, the Board arbitrarily and capriciously can grant exceptions to friends of Board members, local landowners, or to clients of favored lawyers. Because Rule 11.2 provides no standards, there is no way to

prevent or rule out arbitrary and capricious decisions by the Board in granting or denying exceptions unless the Board provides a reasoned explanation for its action, based on the record it has before it. Without reasons, the Board's decision bespeaks arbitrariness and capriciousness.

40. On information and belief, the District has granted exceptions to other large landowners who the District favor based on the crops the grow, personal relationships, and other impermissible distinctions.

## VI.
## DUE PROCESS

41. When the Board notified Larsen of its intent to penalize Larsen for overproduction from certain GPUs , Larsen sought an exception to the District Rules under Rule 11.2. The Board denied that application for exception in NPGCD Board Order No. 023-001. That Order fails to state a rational basis for the denial of Larsen's application. The first three pages of the Order do nothing more than recite the administrative history of Larsen's Application and disclose there was an evidentiary hearing. Nothing is said, however, about the evidence received in that hearing. Pages 3 through 7 merely reproduce statutes and rules, without analyzing them. Finally, on page 7, the Order summarizes things the Board considered and then abruptly rules that Larsen's Application is denied.

42. The Order provides no logic or reasoning that could connect items the Board considered with its decision to deny Larsen's Application. On its very face, the Order is arbitrary and capricious, especially in light of the fact that Rule 11.2 does not provide standards to govern the Board's action. As far as a reader (or reviewing court) can determine, the NPGCD Board could have denied Larsen's Application because Board harbors personal animus against Mr. Larsen, because the Board wanted to impose extra costs on Larsen's operations for the benefit of small, local landowners; or because the Board, despite having Rule 11.2, decided simply never to grant

an exception, regardless of the merits of Larsen's Application. The Order cannot withstand review for arbitrariness and capriciousness, or for being based on substantial evidence.

43. The District's 1600-acre GPU limitation is arbitrary and capricious, the District's decision to rigorously in enforce its GPU limitations against Larsen and not other similarly situated landowners lacks a rational basis and is arbitrary and capricious, and the District's denial of Larsen's application for exception was arbitrary and capricious. Each of these arbitrary and capricious rules and actions have interfered with and destroyed Larsen's constitutionally protected right to its groundwater.

## VII.
## DECLARATORY JUDGMENT

44. Larsen incorporates the preceding paragraphs of this Complaint. Larsen seeks a declaration that Chapter 7 of the Districts Rules and each of the Rules contained therein are *ultra vires* and void.

## VIII.
## INDIVIDUAL DEFENDANTS

45. Larsen's civil rights claims are based on clearly established principles of Texas law. *Stratta v. Roe* at 359 ("What is 'unsettled' about *Day's* interpretation of the common law and statutory rights of groundwater owners?"). The conduct of the Individual Defendants was objectively unreasonable in light of those clearly established principles.

46. Accordingly, the Individual Defendants are not entitled to qualified immunity, and are instead jointly and severally liable for all damages sustained by Larsen.

## IX.
## ATTORNEYS FEES

47. Pursuant to 42 U.S.C.A. § 1988, Larsen requests the Court to award it a reasonable attorneys' fee as part of the costs.

## X.
## JURY DEMAND

48. Larsen demands trial by jury.

## XI.
## PRAYER

WHEREFORE, Larsen respectfully requests that the Court:

1. Enter an order enjoining Directors Defendants from violating the constitutionally protected Equal Protection and Due Process rights of Larsen;

2. Enter an order enjoining the Defendants from enforcing the District's Rules in a manner that results in violations of Larsen's private real property rights;

3. Award compensatory damages to Larsen in an amount to be determined according to proof at trial, together with pre-judgment and post-judgment as provided by law;

4. Enter an order awarding attorneys' fees against all Defendants pursuant to 42 U.S.C.A. § 1988; and

5. Grant such other and further relief as the Court may deem just and proper.

Respectfully submitted,

/s/ *Marvin W. Jones*

SPROUSE SHRADER SMITH PLLC
Marvin W. Jones, SBN 10929100
C. Brantley Jones, SBN 24079808
701 S. Taylor, Suite 500
P.O. Box 15008
Amarillo, Texas 79105-5008
(806) 468-3300; (806) 373-3454 Fax
marty.jones@sprouselaw.com
brantley.jones@sprouselaw.com

***Attorneys for Plaintiffs***