IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

BLF LAND, LLC and BLAINE LARSEN
FARMS, INC.,

        Plaintiffs,

v.

NORTH PLAINS GROUNDWATER
CONSERVATION DISTRICT,

        Defendant.

2:23-CV-133-Z

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiffs' Motion for Partial Summary Judgment ("Plaintiffs' Motion") (ECF No. 54) and Defendant's Cross-Motion for Partial Summary Judgment ("Defendant's Motion") (ECF No. 56). Having considered the foregoing, the Court finds that Plaintiffs' Motion is **DENIED** and Defendant's Motion is **GRANTED**.

The Court is also granting summary judgment to the District on Plaintiffs' *ultra vires* claim. The District did not move for summary judgment on that claim. If Plaintiffs desire to oppose summary judgment for the District on their *ultra vires* claim, they must file a supplemental brief **not to exceed 10 pages within 14 days after this Order is filed**. If they do not, the Court will grant summary judgment for the District. If they do respond, the Court will either enter an order granting or denying summary judgment for the District or order a reply brief from the District.

### BACKGROUND

The parties entered this dispute because Plaintiff potato farmers allegedly over-produced the groundwater beneath their land. Plaintiffs BLF Land, LLC and Blaine Larsen Farms, Inc. (collectively "BLF" or "Plaintiffs") grow the majority of Texas potatoes, irrigating their crops

using the groundwater beneath their land. ECF No. 57 at 4. That groundwater originates from the Ogallala Aquifer ("Aquifer"). *Id.* at 5. Defendant North Plains Groundwater Conservation District ("NPGCD" or the "District") is a regulatory agency created by the Texas Legislature to conserve, protect, and preserve the groundwater resources within its jurisdiction and adopt rules to manage them. TEX. WATER CODE §§ 36.0015(b), 36.1071(f). NPGCD was commissioned to "protect [groundwater] property rights . . . ." *Id.* § 36.0015(b).

The District can regulate the spacing of water wells and groundwater production "[i]n order to minimize as far as practicable the drawdown of the water table or the reduction of artesian pressure . . . [and] to prevent interference between wells." *Id.* § 36.116(a). Dating back to at least 2009, the District imposed regulations to prevent landowners from "overpumping." ECF No. 57 at 8. These rules require landowners to divide their properties into smaller segments and restrict the amount of groundwater a landowner may produce in each portion. *See* NPGCD Rules (adopted Jan. 20, 2009), § 1.3 (defining "Allowable Annual Production"). The District calls these subdivisions "GPUs" — *i.e.*, "Groundwater Production Units." NPGCD Rules (adopted Nov. 14, 2023), § 7.5.

The District provides that "a GPU shall contain no more than 1,600 acres and the most distant diagonal corners of the GPU shall not be more than 25,000 feet apart." *Id.* A landowner may withdraw only 1.5 acre-feet of groundwater per acre of the GPU. *Id.* § 6.1. If he wishes to pump beyond that limitation, the rules force him to disperse groundwater pumping to avoid over-pumping from a single GPU. This withdrawal limitation applies to everyone, regardless of a landowner's total property size.

Plaintiffs' groundwater production exceeded the production limit in certain GPUs from 2020 through 2022. ECF No. 55 at 6. On May 19, 2021, the District notified Plaintiffs that they

overproduced in 2020 and invoiced them for the violations. *Id.* at 547–52. On June 24, 2021, Plaintiffs requested a variance. ECF No. 58-2 at 271. In May of 2022, the District notified BLF of their overproduction violations for 2021. ECF Nos. 55 at 551–58; 58-2 at 242–70. On January 17, 2023, NPGCD's Board Order No. 023-001 denied Plaintiffs' 2021 variance request. ECF No. 55 at 561–67. In June 2023, the District again notified Plaintiffs of their overproduction violations, this time for 2022. ECF No. 58-3 at 2–10. The invoices for these violations totaled $1,793,461.50. ECF No. 55 at 7. After lengthy negotiations, on July 27, 2023, NPGCD demanded a $500,000 payment to resolve the alleged rule violations. *Id.* at 5. Plaintiffs refused.

LEGAL STANDARD

Summary judgment is appropriate if the movant shows there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). The movant meets its initial burden by showing that the "evidence in the record would not permit the nonmovant to carry its burden of proof at trial." *Smith v. Brenoettsy*, 158 F.3d 908, 911 (5th Cir. 1998). Facts are considered "material" only if they "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "In determining whether a genuine issue as to any material fact exists, [courts] must view the evidence in the light most favorable to the nonmoving party." *Fahim v. Marriot Hotel Servs., Inc.*, 551 F.3d 344, 348–49 (5th Cir. 2008).

"[Y]et the nonmovant may not rely on mere allegations in the pleadings; rather, the nonmovant must respond to the motion for summary judgment by setting forth particular facts indicating that there is a genuine issue for trial." *Caboni v. Gen. Motors Corp.*, 278 F.3d 448, 451 (5th Cir. 2002) (citations omitted). Further, "Rule 56 does not impose on the district court a duty to sift through the record in search of evidence to support a party's opposition to summary

3

judgment." *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992). Parties should "identify specific evidence in the record, and . . . articulate the 'precise manner' in which that evidence support[s] their claim." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) (citations omitted). "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted." *Caboni*, 278 F.3d at 451 (citing FED. R. CIV. P. 56(c)).

ANALYSIS

**I. Summary Judgment Evidence**

Much of the summary judgment record is undisputed, but the District objects to two Plaintiff affidavits. First, they object to an affidavit from Amber Warlick, who is "a principal in the firm known as Fearless Eye, Inc. located in Lee's Summit, Missouri." ECF No. 60 at 74. Warlick's affidavit examines twelve GPUs that, it alleges, are non-compliant with the District's requirement that a GPU span no more than 1,600 acres. *Id.* at 76. Second, they object to an affidavit from Plaintiffs' hydrogeological expert, Michael Thornhill. ECF No. 64 at 6. They object to only two of his opinions: "[N]eighbors [of BLF's] whose GPU shapes are different can operate their wells at a greater rate for a longer time," and "[i]f BLF shuts its productive wells down to comply with the GPU Rules, the result is drainage." ECF No. 60 at 93.

Federal Rule of Civil Procedure 26(a)(2) requires parties to disclose "the identity of any witness it may use at trial to present evidence." FED. R. CIV. P. 26(a)(2)(A). "Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report" if the witness "is one retained or specially employed to provide expert testimony in the case." FED. R. CIV. P. 26(a)(2)(B); *see* ECF No. 25 at 4 (requiring, in this Court's scheduling order, all parties to "otherwise comply with Rule 26(a)(2)" in designating experts). That report must contain the

4

underlying bases for any opinions formed, such as the facts or data considered by the witness and any exhibits that will be used to summarize or support them. FED. R. CIV. P. 26(a)(2)(B)(ii), (iii).

"When a district court strikes a party's designation of expert witnesses and excludes their testimony as a sanction for violation of a discovery order" — the relief the District seeks here — the Fifth Circuit "determine[s] whether the court's action is an abuse of discretion by examining four factors." *Sierra Club, Long Star Chapter v. Cedar Point Oil Co., Inc.*, 73 F.3d 546, 572 (5th Cir. 1996). Those factors include (1) the importance of the witnesses' testimony; (2) the prejudice to the opposing party of allowing the witnesses to testify; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation, if any, for the party's failure to comply with the discovery order. *Id.*

### A. The Warlick Affidavit is struck from the summary judgment record.

Plaintiffs' expert disclosures about Warlick are underinclusive. Specifically, those disclosures provide only that she is a

> visualization expert[] who will identify and authenticate still and animated visualizations of the groundwater production units of NPGCD. To the extent that such visualizations rely upon calculations of any kind, . . . Ms. Warlick possess[es] the requisite expertise and experience to testify regarding the accuracy of such calculations. . . . Ms. Warlick has a degree from Southwest Missouri State University in Animation.

ECF No. 28 at 2. These disclosures nowhere reference the underlying data or exhibits she used in her report. In that report, she claims to have "received a link from Sprouse Shrader Smith [Plaintiffs' law firm] containing a folder called 2024.02.21 NPGCD Production data." ECF No. 60 at 75. "Within that link, NPGCD provided a Google Earth .kmz file that contained GPU data for the district." *Id.* She applied "two well-accepted mathematical formulas" to the interactive maps contained in Plaintiffs' attorneys' file to estimate the acreage of non-conforming GPUs. *Id.*

The Court cannot rely on the foregoing affidavit for several reasons. First, Plaintiffs failed to properly disclose the exhibits Warlick utilized in formulating her opinions. *See* FED. R. CIV. P. 26(a)(2)(B)(iii) (requiring disclosure of exhibits). That failure is grounds for excluding expert testimony. *Harmon v. Ga. Gulf Lake Charles LLC*, 476 Fed. Appx. 31, 36–37 (5th Cir. 2012) (upholding the district court's exclusion of expert testimony for failure to comply with Rule 26(a)(2) and explaining that "[i]t is undeniable that [the] initial expert report fails to come close to meeting these criteria [under Rule 26(a)(2)(B)]").

Second, Warlick's affidavit omitted the data forming the basis of her report. *See* ECF No. 60 at 75 (discussing a "link from Sprouse Shrader Smith" without providing the information contained in that link). Omitting that data from her affidavit or otherwise identifying it in a way that would authenticate it before the Court prejudices the District's ability to meaningfully respond to this testimony. *See Sierra Club*, 73 F.3d at 572 (considering prejudice to the opposing party for allowing a witness to testify); *Travland v. Ector Cnty.*, 39 F.3d 319, at *4 (5th Cir. 1994) (per curiam) ("[E]xhibits properly made part of an affidavit may be considered [as summary judgment evidence], but such documents must be authenticated by and attached to an affidavit, and the affiant must be a person through whom the exhibits could be admitted into evidence."); *see also Cruz v. Aramark Servs., Inc.*, 213 Fed. Appx. 329, 332–33 (5th Cir. 2007) (unauthenticated documents may not be relied on as summary judgment evidence); FED. R. CIV. P. 56(c)(2), (4). The weight of authority precludes Plaintiffs from relying on Warlick's affidavit as summary judgment evidence. Thus, the Court strikes it from the summary judgment record.

### B. The Thornhill Affidavit is admissible.

Thornhill's affidavit is admissible. His relevant testimony provides: "neighbors [of BLF's] whose GPU shapes are different can operate their wells at a greater rate for a longer time. If BLF

6

shuts its productive wells down to comply with the GPU Rules, the result is drainage." ECF No. 60 at 93. Plaintiffs' expert disclosures about Thornhill reveal the following opinions: (1) that the District's rules lack scientific or hydrogeological justification; (2) that they fail to promote, further, or help achieve any of the stated or statutory goals of the District; (3) that they result in harm to Plaintiffs and harm to persons owning neighboring properties; and (4) that recent groundwater sales impact the value of groundwater inside the District. ECF No. 28 at 1–2.

The District argues that Thornhill did not explain the basis and reasons for his disclosed opinions in a timely manner. ECF No. 64 at 6; *see* ECF No. 25 at 4 (scheduling order providing that each party must "file a written designation of the name and address of each expert witness who will testify at trial for that party and shall otherwise comply with Rule 26(a)(2) on or before January 19, 2024"). That might be so, but Thornhill, unlike Warlick, articulates some intelligible basis for his testimony. While offered in June 2024, roughly six months past the Court's deadline, the Court **FINDS** that the District suffers no prejudice from this delay. *See Sierra Club*, 73 F.3d at 572 (instructing courts to consider the possibility of curing such prejudices by granting a continuance, the Fifth Circuit makes clear that the goal is for the opposing party to muster an adequate response). The District adequately addressed that testimony in the briefing, and the Court will address it below.

### II. The District has not taken Plaintiffs' property.

Plaintiffs argue that "NPGCD has engaged in a taking of Plaintiffs' real property without compensation" under the Fifth Amendment of the United States Constitution and Section 17 of Article I of the Texas Constitution. ECF No. 55 at 20. The District likewise moves for summary judgment on Plaintiffs' takings claims. ECF No. 57 at 10–16. Under the Takings Clause of the Fifth Amendment, applicable to the States through the Fourteenth Amendment, the government

may not take private property for public use without just compensation. U.S. CONST. amend. V. Takings violations under the Texas Constitution are generally analyzed the same as federal takings claims. *See Edwards Aquifer Auth. v. Day*, 369 S.W.3d 814, 838 (Tex. 2012) (stating that these guarantees are generally construed the same). This Court will address both claims collectively.

The United States Supreme Court recognizes two categories of takings claims — *per se* and regulatory. *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147–48 (2021). A *per se* taking, better known as a physical taking, occurs when private property is "physically acquire[d]" or "invade[d]" by the government. *Id.* at 147, 149. Courts use a "simple, *per se* rule" to assess these claims: "[t]he government must pay for what it takes." *Id.* at 148.

A regulatory taking occurs "when the government, rather than appropriating private property . . . instead imposes regulations that restrict an owner's ability to use his own property . . . ." *Id.* "[W]hile property may be regulated to a certain extent, if a regulation goes too far it will be recognized as a taking." *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922). To determine whether a use restriction is sufficient to constitute a regulatory taking, courts apply a balancing test developed in *Penn Central*. *Cedar Point Nursery*, 594 U.S. at 148 (citing *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978)).

### A. Plaintiffs fail to establish a *per se* taking claim.

Plaintiffs claim that the District's GPU requirements are a *per se* taking in two ways. First, Plaintiffs argue that the GPU requirements block access to their property by preventing them from pumping the full amount of their groundwater rights. ECF No. 55 at 18–19. Second, they claim that the regulations deprive them of the right to exclude others from their groundwater by "preventing [them] from offsetting drainage." *Id.* at 19.

8

**1. Plaintiffs still have access to their property.**

First, Plaintiffs have not been denied their groundwater rights just because they cannot pump all of their water from one spot. Per Texas law, the groundwater under BLF's land is private property, which can be the subject of a takings claim. *See Day*, 369 S.W.3d at 838 ("Today we have decided that landowners do have a constitutionally compensable interest in groundwater . . . ."). But a landowner is entitled only to his "fair share" of groundwater access. *Id.* at 840. The Water Code explains that a "fair share" is not a specific amount. *See* TEX. WATER CODE § 36.002(b-1)(1). ("The groundwater ownership and rights described in this section do not entitle a landowner . . . to the right to capture a specific amount of groundwater below the surface of that landowner's land."). The Fifth Circuit explains that "[a]ffording groundwater owners their fair share 'must take into account factors other than surface area[.]'" *Stratta v. Roe*, 961 F.3d 340, 360 (5th Cir. 2020) (quoting *Day*, 369 S.W.3d at 841).

Here, Plaintiffs argue the GPU production limits prevent them from accessing "the amount of groundwater to which they are entitled under the District's rules," ECF No. 55 at 18, but the rules don't support this contention. Plaintiffs calculate their fair share of groundwater rights at 100,732.6-acre feet of groundwater production per year. ECF No. 55 at 7, n.3. They add that they "control groundwater rights under 67,155.07 acres of land." *Id.* Further, "[i]f allowed 1.5 acre feet per acre, Plaintiffs would be entitled to 100,732.6 acre feet of groundwater production per year." *Id.* But, as established above, Plaintiffs' fair share of groundwater is not necessarily any specific amount — so their calculations prove nothing.

Moreover, surface area is not the only pertinent consideration. *Stratta*, 961 F.3d at 360. The District's apportionment of a fair share should be and is based on a system that considers more factors than how much land someone owns, such as drainage and water levels. *See* ECF Nos. 57

9

at 5, 61 at 6 (explaining that minimizing drawdown of the water table and preventing interference between wells are among the concerns that lead to the GPU rules).

Regardless, the GPU rules do not prohibit Plaintiffs from extracting the water they seek because Plaintiffs can extract their desired water from other GPUs. BLF responds that not all GPUs permit similar water production. ECF No. 55 at 18. Maybe so. But nothing in the District's rules prevent Plaintiffs from extracting their overall desired amount of water. In short, Plaintiffs fail to provide evidence indicating that they cannot pump elsewhere.

It might be most efficient for Plaintiffs to extract water from their most productive GPUs, but the District's dispersion requirements do not constitute a taking. The District is correct that absolute title is not equivalent to absolute access. Texas law clearly limits Plaintiffs' access to the latter. *Day*, 369 S.W.3d at 830.

### 2. Plaintiffs still have the right to exclude others.

Next, the District argues that the GPU rules deny them their right to exclude others from their property. ECF No. 55 at 18 (citing *Cedar Point Nursery*, 594 U.S. at 149, for the proposition that denial of the right to exclude can constitute a taking). Plaintiffs claim that they need to pump from specific wells because the GPU rule "means literally allowing [neighboring landowners] to produce water out from under BLF's property without Plaintiffs being able to exercise their right to offset." ECF No. 55 at 15.

Indeed, "[t]he right to exclude is 'one of the most treasured' rights of property ownership." *Cedar Point Nursery*, 594 U.S. at 149 (quoting *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982)). "According to Blackstone, the very idea of property entails 'that sole and despotic dominion which one man claims and exercises over the external things of the world, in total exclusion of the right of any other individual in the universe.'" *Cedar Point Nursery*, 594

U.S. at 149–50 (quoting W. BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 2 (1766)). Thus, the Supreme Court "has long treated government-authorized physical invasions as takings requiring just compensation." *Cedar Point Nursery*, 594 U.S. at 150.

That venerable authority remains so, but it does not help Plaintiffs here. Plaintiffs have not demonstrated that drainage — beyond what is normal — has occurred or will occur. ECF No. 64 at 12; *see Day*, 369 S.W.3d at 830 ("[A] landowner has a right to exclude others from groundwater beneath his property, but one that cannot be used to prevent ordinary drainage."). Specifically, Thornhill's affidavit fails to explain how the drainage is occurring, where BLF's water is migrating to, or at what rate. *See* ECF No. 60 at 93 ("But neighbors whose GPU shapes are different can operate their wells at a greater rate for a longer time. If BLF shuts its productive wells down to comply with the GPU Rules, the result is drainage.").

Plaintiffs analogize their case to *Cedar Point Nursery*, which found a *per se* taking when a regulation gave labor organizations the right to access a farmer's property to solicit union support. 594 U.S. at 143. But the "right to exclude" principle from that case, *id.* at 149–50, is of no value here because Plaintiffs cannot prove that the use of their property has been given to anyone else — let alone that others are actually entitled to some specific amount.

*Marrs v. R.R. Comm'n*, 177 S.W.2d 941 (Tex. 1944) is also inapposite. There, the Texas Supreme Court found a *per se* regulatory taking when a landowner was unable to recover oil before it drained to the neighbor's property. *Id.* at 948. "As a result," the court held, "petitioners are being forever deprived of their property. It is the taking of one man's property and the giving it to another." *Id.* Plaintiffs assert that their case is similar because "if the five most productive GPUs on Plaintiffs' farm must be switched off before the end of the 130-day growing season, the neighbor's production will invariably drain water from those five GPUs." ECF No. 62 at 10.

11

Plaintiffs are incorrect because they provide no summary judgment evidence regarding their neighbors' drainage. *See* ECF No. 60 at 93 (Thornhill's affidavit stating that "neighbors whose GPU shapes are different can operate their wells at a greater rate for a longer time. If BLF shuts its productive wells down to comply with the GPU Rules, the result is drainage."). That is significant because the pressure-sink disparity caused the drainage in *Marrs*. *See Marrs*, 117 S.W.2d at 945 ("This difference in the bottom hole pressure tended to create a 'pressure sink' in the Church-Fields area and to cause the oil to migrate thereto."). There, the petitioners complained that their neighbor's land was drained to such an extent that, before petitioners could adequately capture their own oil, it filtered off into their neighbor's property. *Id.* But here, we know nothing about the relative disparity between Plaintiffs' land and their neighbors'. That failure to connect the dots undercuts a regulatory *per se* taking because the Court lacks all necessary predicates to make that drainage determination.

### B. Plaintiffs fail to establish a regulatory taking claim.

A *per se* taking may also occur in the "rare situation[]" where a "regulation denies all economically beneficial or productive use of land." *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992) (positing that "total deprivation of beneficial use is, from the landowner's point of view, the equivalent of a physical appropriation"). But when the government "instead imposes regulations that restrict an owner's ability to use his own property," the "flexible test developed in *Penn Central*" applies. *Cedar Point Nursery*, 594 U.S. at 139, 148.

The Supreme Court held that the foregoing and rare *per se* taking inquiry is appropriate for the jury in limited circumstances. *See City of Monterey v. Del Monte Dunes*, 526 U.S. 724, 740–41 (1999) ("[W]e hold that the issue whether a landowner has been *deprived of all economically viable use of his property* is a predominantly factual question . . . [that is] for the jury.")

(emphasis added). Thus, *Monterey*'s holding applies to the "rare situation" of *per se* takings where a regulation denies all economically beneficial or productive use of land. *Lucas*, 505 U.S. at 1015.

Plaintiffs argue that *Monterey* precludes summary judgment here, ECF No. 59 at 13, 15, but they are incorrect. First, Plaintiffs do *not* argue that the District's regulations deprive them of all economically beneficial use of their property. *See* ECF No. 59 at 7 (distinguishing between complete physical appropriation of property and a complete deprivation of all economically beneficial use of their property, Plaintiffs argue that "[t]his case involves the former type of *per se* taking"). That is significant because complete economic deprivation is the only takings issue that *might* be properly before a jury. *Monterey*, 526 U.S. at 740–41. By contrast here, Plaintiffs' regulatory takings claim arises under the *Penn Central* factors.

Second, the Fifth Circuit has not confirmed a *per se* taking on summary judgment even when the issue was complete economic deprivation of land use. *Golden Glow Tanning Salon, Inc., v. City of Columbus*, 52 F.4th 974, 981 (5th Cir. 2022) (Jones, J.). There, the court explained that a COVID-19-based salon closure "constitutes a deprivation of *some* economically productive uses," but "[n]othing in the record supports the conclusion that the City Ordinance rendered the entire property 'valueless.'" *Id.* In other words, even under the rare case of alleged complete economic deprivation, courts may still evaluate the summary judgment record to determine if there is a genuine dispute of material fact properly before the jury.

Again, the Court need not make that determination here because *Monterey*'s limited counsel does not govern the *Penn Central* inquiry. That "require[s] considering factors such as the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the government action." *Horne v. Dep't of Agric.*, 576 U.S. 350, 360 (2015). When "the force of [one] factor is so overwhelming," it may dispose of the taking

question. *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005 (1984).

### 1. Economic Impact

Analyzing the economic impact of the District's rules requires "compar[ing] the value that has been taken from the property with the value that remains in the property." *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 936 (Tex. 1998). Although diminution in value alone cannot establish a taking, *Penn Central*, 438 U.S. at 131, "a greater diminution in value weighs more heavily in favor of finding that a Taking has occurred," *DM Arbor Court, Ltd. v. City of Houston*, 681 F. Supp. 3d 713, 742 (S.D. Tex. 2023). However, "economic impact alone is not sufficient to create a taking." *Id.* at 743. That is because "the character of the government action," the third *Penn Central* factor, "is a highly significant factor that weighs heavily in the [government's] favor." *Id.* at 745.

No authority, to this Court's knowledge, has ever found economic impact that could warrant a taking where the property's value fell less than 42.5%. *Id.* at 743; *see, e.g.*, *Pulte Home Corp. v. Montgomery Cnty.*, 909 F.3d 685, 696 (4th Cir. 2018) (assuming 83% reduction in value); *MHC Fin. Ltd. P'ship v. City of San Rafael*, 714 F.3d 1118, 1127 (9th Cir. 2013) (81% reduction in value); *Colony Cove Props., LLC v. City of Carson*, 888 F.3d 445, 451 (9th Cir. 2018) (diminutions ranging from 75% to 92.5%); *CCA Assocs. v. United States*, 667 F.3d 1239, 1246 (Fed. Cir. 2011) ("[W]e are aware of no case in which a court has found a taking where diminution in value was less than 50 percent.") (internal marks omitted); *Hadacheck v. Sebastian*, 239 U.S. 394, 405 (1915) (92.5% reduction in value).

Here, there is no genuine dispute of material fact that, at worst, the District's rules reduced Plaintiffs' land value by 9%. *See* ECF No. 58-4 at 3 (Plaintiffs' Appraisal Report, finding that their land's value without the District's rules is $196 million, while the value with the rules is $180

million — a 9% reduction). The District approximates only a 2% decrease in value as a result of the rules. *See* ECF No. 58-5 at 3–4 (District's Appraisal Report, finding that Plaintiffs' land's value without the District's rules is $224,180,000, while the value with the rules is $219,880,000). Even construed most favorably to Plaintiffs by using their expert report, this Court **FINDS** that the rules' economic impact is not significant enough to suggest a regulatory taking under *Penn Central*. It would break new constitutional ground to hold that a mere single-digit reduction in value would constitute a regulatory taking. The Court sees little reason for such adventurism here.

### 2. Investment-Backed Expectations

The next *Penn Central* prong considers the extent of the District's interference with Plaintiffs' reasonable investment-backed expectations. "What is relevant and important in judging reasonable expectations is the regulatory environment at the time of the acquisition of the property." *Bridge Aina Le'a, LLC v. Land Use Comm'n*, 950 F.3d 610 (9th Cir. 2020) (internal marks omitted). That is because "[t]hose who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end." *Concrete Pipe & Prods. v. Constr. Laborers Pension Tr.*, 508 U.S. 602, 645 (1993) (quoting *FHA v. The Darlington, Inc.*, 358 U.S. 84, 91 (1958)).

Here, Plaintiffs raise no genuine dispute of material fact that the District's rules interfered with their investment-backed expectations. Save for nomenclature, the NPGCD Rules on Withdrawals and Pooling were substantively identical to the version currently in effect when BLF purchased its property in 2011 and 2012.[1] Before that purchase, BLF's lender appraised the land's

---

[1] *Compare* NPGCD Rules (adopted January 20, 2009), §§ 1.3 (defining "Allowable Annual Production"), 1.34 (defining "Pooling"), 1.36 (defining "Pooled Water Rights"), and 1.37 (defining "Property") at ECF No. 58-2 at 81, 85; NPGCD Rules (adopted January 20, 2009), § 2.1(D) (providing that landowners' well production is limited to Allowable Annual Production for the Property as defined in Rule 3 and in accordance with other NPGCD Rules) at ECF No. 58-2 at 91; NPGCD Rules (adopted January 20, 2009), § 2.1(E) (providing for metering and the imposition

15

value subject to the District's 2009 rules, which, as noted above, were substantively the same as the current rules. ECF No. 58-5 at 267–68. Plaintiffs raise no contention on the summary judgment record that the District's rules interfered with their reasonable investment-backed expectations. Based on the foregoing omission and analysis, the Court **FINDS** no interference here.

### 3. Character of the Government Action

The final *Penn Central* prong considers the character of the District's action. "There is little doubt that it is appropriate to consider the harm-preventing purpose of a regulation in the context of the character prong of a *Penn Central* analysis." *Rose Acre Farms, Inc. v. United States*, 559 F.3d 1260, 1281 (Fed. Cir. 2009). Other courts have found that "the character of the government action is a highly significant factor that weighs heavily in the [government's] favor," especially when the action serves the public good. *DM Arbor*, 681 F. Supp. 3d at 745.

Here, the District's rules regulate groundwater production "to minimize as far as practicable the drawdown of the water table or the reduction of artesian pressure, to control subsidence, to prevent interference between wells, to prevent degradation of water quality, or to prevent waste." TEX. WATER CODE § 36.116(a). These public-oriented justifications for regulating groundwater production sufficiently justify the District's rules as applied to Plaintiffs. Plaintiffs contest whether the District fulfills these statutorily authorized purposes, but as Section III.A *infra* demonstrates, it does. Therefore, the Court **FINDS** that the character of the District's rules counsel against finding a taking on summary judgment.

---

of civil penalties and injunctive relief if a landowner exceeds their Allowable Annual Production) at ECF No. 58-2 at 92; NPGCD Rules (adopted January 20, 2009), §§ 3 (Allowable Annual Production, Metering and Reporting of Production), 3.3 (Allowable Annual Production), at ECF No. 58-2 at 92–93; and NPGCD Rules (adopted January 20, 2009), Rule 17 (Pooling) at ECF No. 58-2 at 116–17 *with* NPGCD Rules (adopted April 14, 2015) (GPUs) at ECF No. 58-2 at 191–92.

\* \* \*

The summary judgment does not support a taking finding under any of the *Penn Central* factors. Therefore, Plaintiffs' regulatory takings claim against the District fails as a matter of law.

### III. Plaintiffs' *Ultra Vires* Claim

Plaintiffs seek a declaratory judgment that the District exceeded its limited powers under the Texas Water Code by utilizing GPUs to limit water production. ECF No. 55 at 9–13. Neither party disputes that the District is subject to "a very limited number of corporate functions." *Tri-City Fresh Water Supply Dist. No. 2 v. Mann*, 142 S.W.2d 945, 948 (Tex. 1940). That is because "[t]he powers of such districts are measured by the terms of the statutes which authorized their creation, and they can exercise no authority that has not been clearly granted by the legislature." *Id.*

"In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or can be sought." 28 U.S.C. § 2201(a). "Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." *Id.*

### A. The District's rules fulfill the Water Code's statutory purposes.

Plaintiffs argue that the District exceeded two statutory limitations. First, they claim that the District failed to satisfy any statutory purpose for regulating the production of groundwater. ECF No. 55 at 9–12. The Texas Water Code permits the District to regulate groundwater production for the following reasons: "to minimize as far as practicable the drawdown of the water table or the reduction of artesian pressure, to control subsidence, to prevent interference between wells, to prevent degradation of water quality, or to prevent waste." TEX. WATER CODE

17

§ 36.116(a). The District, per Plaintiffs, "has provided no evidence" that it fulfills these foregoing purposes. ECF No. 62 at 7.

That is not so. At a minimum, the District has proffered uncontested summary judgment evidence that its rules minimize drawdown of the water table. Its hydrological expert, Wade Oliver, produced models "to try and quantify the impact of additional production above that 1.5 acre-feet per acre [production limit per GPU]" on one of Plaintiffs' historically overproduced GPUs. ECF No. 63 at 8. He concluded that "additional production above the 1.5 acre-feet per acre would result in up to 30 feet of additional drawdown" within that GPU over the desired future condition timeline from 2018 through 2080, with all other conditions static. *Id.* at 9. The District, relying on this summary judgment evidence, rightly concludes that "the GPU rules prevent landowners from pumping water excessively in one area of their property — and thus, contributing to further drawdown in that area, which would not occur but for the excess pumping." ECF No. 61 at 8.

The District's rules clearly fulfill the foregoing statutory purposes. *See* TEX. WATER CODE § 36.116(a) (authorizing production "to minimize as far as practicable the drawdown of the water table"). Because Plaintiffs failed to address this evidence in their reply brief and otherwise failed to respond, they are not entitled to summary judgment on this basis.

### B. The District used the proper means of regulating groundwater production.

Second, Plaintiffs claim that the District's "GPU rule does not meet the allowed regulatory methods related to production limitations." ECF No. 55 at 12. The District may regulate the production of groundwater by "limiting the amount of water produced based on acreage or tract size," TEX. WATER CODE § 36.116(a)(2)(B), "limiting the maximum amount of water that may be produced on the basis of acre-feet per acre or gallons per minute per well site per acre," *id.* § 36.116(a)(2)(D), or "any combination of the methods listed above," *id.* § 36.116(a)(2)(F).

The parties dispute whether "tract size" under Section 36.116(a)(2)(B) permits the District to regulate groundwater production with GPUs. The Water Code does not define "tract" or "tract size," so this Court must ascertain its ordinary and common meaning. *See Camacho v. Ford Motor Co.*, 993 F.3d 308, 312 (5th Cir. 2021) ("When faced with an undefined statutory term, our job is to apply the 'common, ordinary meaning unless a more precise definition is apparent from the statutory context or the plain meaning yields an absurd result.'") (quoting *Fort Worth Trans. Auth. v. Rodriguez*, 547 S.W.3d 830, 838 (Tex. 2018)). That endeavor requires the Court to "consider a variety of sources, including dictionary definitions, judicial constructions of the term, and other statutory definitions." *Colo. Cnty. v. Staff*, 510 S.W.3d 435, 448 (Tex. 2017).

A tract is "[a] specified parcel of land." Black's Law Dictionary 1803 (12th ed. 2024). A parcel, in turn, is "[a] tract of land; esp., a continuous tract or plot of land in one possession, no part of which is separated from the rest by intervening land in another's possession." *Id.* at 1336. Construing a contract under the foregoing authorities, a Texas state court of appeals explained that a "tract" is an "individual parcel described that does not share a common border with another parcel under common ownership." *Tier 1 Res. Partners v. Del. Basin Res., LLC*, 633 S.W.3d 730, 741 (Tex. App. — El Paso 2021, pet. dism'd). Plaintiffs conclude that "the ordinary meaning of 'tract' includes both a contiguity element and possession element." ECF No. 62 at 5. They argue that these ostensible elements preclude the District from defining tract size in the form of GPUs, hence making this method of groundwater regulation *ultra vires* under the Water Code. *Id.* at 5–6.

Plaintiffs' construal is incorrect because tract size *is* a matter of party discretion. The issue in *Tier 1* relevant here was whether 1,280 acres of land amounted to one total tract or two 640-acre tracts under an oil-and-gas lease agreement. *Tier 1*, 633 S.W.3d at 739. The court, in holding that the lease at issue described two 640-acre tracts, relied on the contract language

19

describing "separately designated tracts." *Id.* at 740. Based on that language, the court reasoned that "those separately designated tracts [must be] described somewhere within the lease." *Id.* It found that they were. *See id.* at 741 ("It is undisputed Section 6 and Section 2 are both standard 640-acre sections that do not share a border; they are separated by another standard section and a distance of approximately one mile. . . . Thus, the only reasonable interpretation of the plain language . . . is that Section 6 and Section 2 are two separately designated tracts.").

The *Tier 1* record never specified who owned the standard section of land separating the two tracts — the lessors or a third party. That omission is significant here because Plaintiffs argue that so long as land is contiguous and owned by the same person, it is a tract. *See* ECF No. 62 at 5 (concluding that "the ordinary meaning of 'tract' includes both a contiguity element and possession element"). If that is true, they argue, the District subdividing Plaintiffs' land into tracts — GPUs — for regulating groundwater production would be *ultra vires*.

However, Plaintiffs fail to demonstrate that tracts contain a "possession element" that would preclude the District from designating GPUs. *Id.* First, *Tier 1* never states that parties cannot subdivide their land into multiple tracts. Second, neither do the dictionaries. Black's defines "tract" as a "specified parcel of land," and defines a parcel, in turn, as "[a] tract of land." BLACK'S LAW DICTIONARY, *supra*, at 1803, 1336. These circular definitions provide no definite meaning for either term. Black's adds that a special kind of parcel may "esp." be "a continuous tract or plot of land in one possession, no part of which is separated from the rest by intervening land in another's possession." *Id.* at 1336.

Nothing in the foregoing precludes the District from designating GPUs. A GPU is merely a subdivision of one owner's property containing no more than 1,600 acres. NPGCD Rules (adopted Nov. 14, 2023), § 7.5. The foregoing definitions equally allow the District to designate

20

multiple contiguous tracts on an owner's property, so long as that tract has one owner. What the District may not do under this scheme is designate land with separate owners as one tract. But no party disputes on summary judgment that Plaintiffs own all relevant land here.

Thus, tract size ultimately remains a matter of party discretion.[2] At the highest level of generality, this Court ascertains that a tract is a parcel and a parcel is a tract. Some parcels might be contiguous under possession of the same owner. But no authority specifies who may define tract size. That omission is crucial here because under Section 36.116(a)(2)(B) of the Water Code, the District has authority to regulate groundwater production based on tract size. The District rightly concludes that the "only logical interpretation" of this section "is that the allowable limitation of water produced based on acreage or tract size must give the District the ability to define what that tract size is for administrative purposes, which it has done through the 1,600-acre limitation applied to GPUs." ECF No. 61 at 11. The District adds that if the Texas Legislature intended the District to regulate groundwater production based on tract size, "it would be a ludicrous result for a district not to be able to designate what area the defined piece of land covers to which the limitation applies." *Id.*

In conclusion, Section 36.116(a)(2)(B) must afford the District authority to define tract size. It authorizes the District to "limit[] the amount of water produced based on acreage or tract size." The terms "acreage" and "tract size" lack any definite statutory meaning unless the District specifies. Plaintiffs' reading — that "tract size" is merely the size of an owner's land — amounts to a non-administrable tautology. This reading would strip the District of all parameters by which

---

[2] *See, e.g.*, *Tract*, MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/tract [https://perma.cc/4U22-R4RV] ("an area either large or small[,] such as an indefinite stretch of land [or] a defined area of land"); *Tract*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/dictionary/english/tract [https://perma.cc/BE39-9KQM] ("a large area of land [or] a measured area of land that is used for a particular purpose, such as building houses or digging for oil").

it could regulate groundwater production — the very structure Section 36.116(a)(2) exists to provide. This Court therefore holds that the Water Code authorizes the District to define tract size. This Court further holds that the District was statutorily authorized to do so by designating GPUs under Sections 36.116(a)(2)(B), (D) (on the basis of acre-feet per acre), and (F) (permitting any combination of the foregoing methods). Thus, the District did not act *ultra vires* of its statutory authority, meaning Plaintiffs' claim fails on summary judgment.

### C. The District is entitled to summary judgment on Plaintiffs' *ultra vires* claim.

This Court further holds that the *District* is entitled to summary judgment on Plaintiffs' *ultra vires* claim. This is noteworthy because only Plaintiffs moved for summary judgment on their *ultra vires* claim. ECF No. 55. The District did not. ECF No. 57 at 9–10. While "it would be error to grant summary judgment on a ground not raised," *Jackson v. Fed. Exp. Corp.*, No. 3:03-CV-2341, 2006 WL 680471, at *9 (N.D. Tex. Mar. 14, 2006), "[t]he court can raise *sua sponte* that summary judgment is warranted on a particular claim, provided it affords the nonmovant notice and a fair opportunity to file an opposition response." *Nunn v. State Farm Mut. Auto. Ins. Co.*, 729 F. Supp. 2d 801, 810 (N.D. Tex. 2010) (citing *Arkwright-Bos. Mfrs. Mut. Ins. Co. v. Aries Marine Corp.*, 932 F.2d 442, 445 (5th Cir. 1991)).

Therefore, if Plaintiffs desire to oppose summary judgment for the District on their *ultra vires* claim, they must file a supplemental brief **not to exceed 10 pages within 14 days after this Order is filed**. If they do not, the Court will grant summary judgment for the District on Plaintiffs' *ultra vires* claim. If they do respond, the Court will either enter an order granting or denying summary judgment for the District or order a reply brief from the District.

### IV. Plaintiffs' Due Process Claim

The District argues that Plaintiffs cannot prevail on either their procedural or substantive due process claims because "BLF was afforded ample due process." ECF No. 57 at 19. The District is correct.

#### A. Plaintiffs received procedural due process.

To succeed on their procedural due process claim, Plaintiffs must demonstrate "that the deprivation of [their] property right occurred without due process of law." *Marco Outdoor Advert., Inc. v. Reg'l Trans. Auth.*, 489 F.3d 669, 672 (5th Cir. 2007). "[T]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Matthews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). The due-process opportunity "is not a technical conception with a fixed content unrelated to time, place and circumstances," *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895 (1961), but rather "is flexible and calls for such procedural protections as the particular situation demands," *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).

The summary judgment evidence demonstrates that Plaintiffs received the following process in seeking — and ultimately failing to obtain — a variance request from the District's GPU rules. First, Plaintiffs' counsel submitted a variance request on June 29, 2021, asking the District to "please accept this letter as a verified request for a variance from Rules 7.5 and 7.6." ECF No. 58-5 at 287. Second, after Plaintiffs submitted additional materials for its request, the District issued a "Notice of Public Hearing on Application for Exception to the Rules of the North Plains Groundwater Conservation District" on November 29, 2022. ECF No. 58-2 at 274–75. That notice solicited "[w]ritten comments on the Application for Exception" due on December 9, 2022, *id.* at 275, and was published in the Amarillo Globe-News on December 2, 2022, *id.* at 277.

23

Third, the District held a public hearing on December 13, 2022, to address Plaintiffs' variance request. ECF No. 58-5 at 290 *et seq.* There, Plaintiffs' counsel made a brief opening statement, called two witnesses — Sabrine Leven, a GPU consultant, and Michael Thornhill, Plaintiffs' retained hydrogeologist — and made a closing statement in support of the variance request. *Id.* at 298–341. Over roughly 40 pages of testimony, Leven testified about her role assisting BLF to comply with annual GPU-production limits, BLF's land use pursuant to the GPU rules, and alleged penalties for overpumping. *Id.* Thornhill also explained his credentials and analyzed the rules' effect on withdrawals and pooling. *Id.* Finally, other local farmers offered testimony. One farmer, Travis Taylor, opined:

> If you have a shallower area, I know it's probably very gradual, but if, you know, we're farming long-term here or we're trying to farm long-term here. So I don't care if it's ten years, a well field is going to have an impact. It may not be today or tomorrow, but a well field in a higher saturated thickness area is going to pull that water from the shallower areas over time.

*Id.* at 346.

Fourth and finally, the District denied Plaintiffs' variance request in its NPGCD Board Order No. 023-001, issued on January 17, 2023. ECF No. 58-2 at 282. That order recited the foregoing procedural history and noted that "[e]vidence offered at the hearing by BLF and the District was admitted into evidence by the Presiding Officer." *Id.* at 278. Before issuing the basis of its opinion, the order added that "[a]ll matters in controversy, including questions of fact, were submitted to the Board." *Id.*

Plaintiffs argue that the foregoing process was insufficient, but the Court is not convinced. First, Plaintiffs' caselaw counseling against a *post hoc* rationalization for the denial is inapposite. They cite *Data Mktg. P'ship, LP v. United States DOL*, 45 F.4th 846, 856 (5th Cir. 2022) for the proposition that "the fact that an agency provided a *post hoc* rationalization is relevant evidence

24

that the action is arbitrary and capricious." ECF No. 59 at 18. But *Data Marketing* concerned judicial review under the Administrative Procedure Act, which is a separate analysis from procedural due process. *Data Mktg.*, 45 F.4th at 855–56. Without further briefing and better reasons, this Court will not conflate these distinct bodies of caselaw.

Second, and more importantly, the District's decision was never arbitrary and capricious. Its order denying Plaintiffs' variance request incorporated all prior procedures spanning from July 20, 2021, through the December 13, 2022 hearing. ECF No. 58-2 at 276–77. At the hearing, witnesses provided ample testimony to the District counseling against overproduction in one particular GPU because of the impact that might have for drawdown on the water table. *See, e.g.*, ECF No. 58-5 at 346–47 (testimony of Travis Taylor). Preventing drawdown is one of the express statutory purposes justifying the District's regulation of groundwater production. TEX. WATER CODE § 36.116(a). The District incorporated these concerns into its order denying Plaintiffs' variance request, ECF No. 58-2 at 278, so there is little basis for Plaintiffs to claim arbitrariness and capriciousness.

### B. Plaintiffs received substantive due process.

The District next moves for summary judgment on Plaintiffs' substantive due process claim. So-called "substantive due process" protects individuals form governmental conduct that "shocks the conscience or interferes with rights implicit in the concept of ordered liberty." *U.S. v. Salerno*, 481 U.S. 739, 746 (1987). To establish a substantive due process claim, Plaintiffs must demonstrate that (1) they have a protected property interest in groundwater and (2) that the government arbitrarily and irrationally infringed on that right. *Clubside, Inc. v. Valentin*, 468 F.3d 144, 152 (2d Cir. 2006). The parties do not dispute Plaintiffs' protected property interest in their groundwater.

25

Plaintiffs cannot seriously claim that the District's rules are conscience-shocking. They argue that the rules fail to achieve their statutory objectives and that the District proffered *post hoc* rationalizations in their favor. The foregoing analysis in Sections III.A and IV.A sufficiently address these concerns. The District did not violate Plaintiffs' substantive due process rights. And this Court is not inclined to invent new substantive due process rights lacking historical pedigree. *See Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (stating that substantive due process "protects those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition'") (quoting *Moore v. City of East Cleveland*, 431 U.S. 494, 503 (1977)); *compare Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381 (6th Cir. 2005) (finding no fundamental right to wear blue jeans in public schools) *with Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534–35 (1925) (recognizing "the liberty of parents and guardians to direct the upbringing and education of children under their control").

\* \* \*

In summary, the District prevails on summary judgment regarding Plaintiffs' procedural and substantive due process claims.

### V. Plaintiffs' Equal Protection Claim

The District argues that it is entitled to summary judgment on Plaintiffs' equal protection claim. ECF No. 57 at 16–18. The Equal Protection Clause of the Fourteenth Amendment provides, in pertinent part, that no State shall "deny to any person . . . the equal protection of the laws." U.S. CONST. amend. 14, § 1. Plaintiffs argue that they are members of a "definable class," namely "large landowners," ECF No. 59 at 16. Plaintiffs define that class of large landowners as "any landowner that has more than 1600 acres" with "enough property to establish multiple GPUs." *Id.* But nowhere do Plaintiffs claim that they are a suspect class protected under the Equal Protection

Clause. Nor is this Court aware of any authority designating large landowners under the foregoing description as a protected class under the Equal Protection Clause.

But Plaintiffs may still assert an equal protection claim "that is premised on differential treatment but not based on membership in a suspect class or the infringement of a fundamental right," because this "may be cognizable as a so-called 'class of one.'" *Wood v. Collier*, 836 F.3d 534, 539 (5th Cir. 2016) (citing *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)). The Fifth Circuit reviews such claims "under a two-prong test: the plaintiff must show that (1) he or she was intentionally treated differently from others similarly situated and (2) there was no rational basis for the difference in treatment." *Wood*, 836 F.3d at 539.

Under this class-of-one equal protection claim, Plaintiffs argue that they were intentionally treated differently from other large landowners. While it is dubious whether Warlick's affidavit *supra* would have justified a class-of-one equal protection claim, its exclusion is fatal for Plaintiffs. They proffer no other summary judgment evidence even suggesting that they were treated differently from other landowners similarly situated, the first element of a class-of-one equal protection claim. *Wood*, 836 F.3d at 539. Therefore, the Court grants summary judgment for the District on this claim.

\* \* \*

CONCLUSION

Based on the foregoing reasons, Plaintiffs' Motion is **DENIED** and Defendant's Motion is **GRANTED**.

The Court is also granting summary judgment to the District on Plaintiffs' *ultra vires* claim. The District did not move for summary judgment on that claim. If Plaintiffs desire to oppose summary judgment for the District on their *ultra vires* claim, they must file a supplemental brief **not to exceed 10 pages within 14 days after this Order is filed**. If they do not, the Court will grant summary judgment for the District. If they do respond, the Court will either enter an order granting or denying summary judgment for the District or order a reply brief from the District.

**SO ORDERED**.

November 13, 2024.

_____
MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE